UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.

SECURITIES AND EXCHANGE COMMISSION,   )
                                      )
                  Plaintiff,          )
                                      )
v.                                    )
                                      )
NEVIN K. SHAPIRO,                     )
                                      )
                  Defendant.          )
_____ )

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

### I. INTRODUCTION

1.      The Commission brings this action to enjoin Defendant Nevin K. Shapiro from violating the anti-fraud provisions of the federal securities laws.

2.      From no later than February 2003 until at least November 2009, Shapiro, directly and through his company Capitol Investments USA, Inc., operated an offering fraud that, by January 2005, devolved into a massive Ponzi scheme. All told, Shapiro raised approximately $900 million from investors through these fraudulent schemes.

3.      Shapiro solicited investments for Capitol primarily during personal discussions, where he promised to refund prospective investors' principal within thirty days and pay 10% to 26% annual returns on their investment. Shapiro told prospective investors this was a risk-free investment in Capitol's grocery business and touted Capitol's financial success as well as his own. Shapiro assured prospective investors Capitol's purchase contracts and accounts receivable secured their investments.

4. In reality, Shapiro misappropriated at least $38 million of investor contributions to finance his lavish lifestyle and fund unrelated personal business ventures.

5. By late 2004, Capitol was operating at a loss. From 2005 though late 2009, Capitol had almost no business operations. To hide this from investors, Shapiro merely repaid earlier investors with approximately $769 million collected from new investors in typical Ponzi scheme fashion.

6. Through the conduct set forth above and described in more detail below, Shapiro violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b) and 17 C.F.R. §240.10b-5].

7. The Commission asks the Court to enter: (1) a permanent injunction restraining and enjoining Shapiro from violating the federal securities laws; (2) an order directing Shapiro to submit a sworn accounting and disgorge all ill-gotten gains, with prejudgment interest; and (3) an order directing Shapiro to pay civil penalties.

## II. DEFENDANT AND RELATED PARTY

### A. Defendant

8. Shapiro, 41, resides in Miami Beach, Florida. He was Capitol's founder, sole shareholder, president, and CEO. Shapiro controlled all aspects of Capitol's business and fundraising efforts. He met with investors on Capitol's behalf and signed promissory notes, personal guarantees and joint venture agreements, and approved payments to investors.

### B. Related Entity

9. Capitol is a Florida corporation formed in 1998 with its principal place of business in Miami Beach. Capitol was a grocery diverter and food broker. Grocery diverters

purchase lower-priced groceries from vendors in one region of the country and resell them for a profit to buyers in another region where prices are higher.  Capitol has never registered an offering or class of securities under the Securities Act or the Exchange Act.  On November 30, 2009, a group of investors filed an involuntary bankruptcy petition against Capitol in the United States Bankruptcy Court for the Southern District of Florida.  On that same day, investors also filed a petition to place Shapiro into personal bankruptcy.  On December 10, 2009, the Bankruptcy Court appointed a Chapter 7 interim Trustee and administratively consolidated both the personal and corporate bankruptcy cases.

### III.  JURISDICTION AND VENUE

10. The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

11. The Court has personal jurisdiction over Shapiro, and venue is proper in the Southern District of Florida because many of his acts and transactions constituting violations of the Securities and Exchange Acts occurred in the Southern District of Florida.  More specifically, Capitol's principal place of business is in the Southern District of Florida, Shapiro solicited investors from the Southern District of Florida, and Shapiro resides in this District.

12. In connection with the conduct alleged in this Complaint, the Defendant, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## IV. THE DEFENDANT'S FRAUDULENT INVESTMENT SCHEME

### A. Overview Of The Scheme

13. From no later than February 2003 through at least November 2009, Shapiro and Capitol raised money from investors to privately finance Capitol's business. Shapiro marketed Capitol's business primarily through relationships he had developed in the grocery industry. Shapiro managed all aspects of Capitol's business and had direct contact with investors whom he used to fund his business.

14. Shapiro told prospective investors Capitol would use their funds as short-term or bridge loans with a five to thirty-day duration to purchase grocery products and resell the products in other regions at a higher price.

15. Shapiro pitched the investment opportunity to individuals as a risk-free way to earn high returns in a short period of time. Shapiro told prospective investors Capitol would pay the interest from the profits it received when it resold goods. Shapiro assured prospective investors there was virtually no risk to their principal because Capitol did not purchase products before it had sales orders, thus guaranteeing Capitol would be paid for brokering the merchandise.

16. Through Capitol, Shapiro offered investors purportedly no-risk promissory notes with annual returns of 10 to 26 percent (higher in some cases), paid in monthly installments. The promissory notes indicated the terms of the investment such as the principal amount, the rate of return, and the duration of the note, which spanned anywhere from a few days to a year. Shapiro told investors Capitol would refund the principal within 30 days. Some investors used funds from their Individual Retirement Accounts to invest with Capitol. Many investors elected to reinvest their principal while receiving monthly returns.

17. Shapiro touted Capitol's successful track record, but did not provide any details about its financial condition. Instead, he assured prospective investors their principal would be secure because Capitol's purchase receivables backed it. For example, in Capitol's offering materials, Shapiro hyped the Company's successful track record, citing continued growth and gross sales of $64 million in 2008, and projecting gross sales of $70 million in 2009.

18. In some cases, Shapiro executed personal guarantees of investors' funds. Shapiro reassured investors by boasting of his own wealth and making it appear he had "deep pockets." Shapiro enjoyed a high profile in South Florida, bolstered by his lavish spending, his association with professional athletes through a sports representation company he established, and extravagant donations to charities – all ultimately funded with investors' money.

19. To raise funds, Shapiro also attracted investors through word-of-mouth from friends and business associates. Shapiro paid handsome sales commissions to individuals who attracted new investors.

20. Capitol collected investors' funds via check or wire transfer and deposited the money into Capitol's bank accounts. These were the same accounts Shapiro used for general operations, to pay interest and commissions, and to channel funds to his other businesses.

21. From no later than February 2003 through November 2009, Shapiro, directly and through Capitol, raised approximately $900 million (including reinvestments) from more than 60 investors. Most of these investors lived in Florida or Indiana.

### B. Material Misrepresentations and Omissions To Investors And Misappropriation of Investor Funds

22. In connection with Capitol's offering, Shapiro made numerous material misrepresentations and omissions regarding, among other things, the safety and security of

5

investors' principal and returns, the success of Capitol's business, the source of purported investment returns, and the use of investor funds.

23. For example, Shapiro's claims of Capitol's success in the grocery diverting business, the no-risk nature of the investment, and the source of investor returns were demonstrably false.

24. Starting no later than 2004, Capitol operated at a loss. By January 2005, Capitol had ceased to conduct any significant business. Capitol's sales were less than $300,000 in 2005 and 2006, and it had no sales from 2007 through 2009.

25. However, Shapiro hid those losses from investors, paying principal to existing investors of approximately $769 million from approximately $880 million in new investor funds raised from January 2005 through November 2009.

26. Shapiro also fabricated invoices and purchase orders for nonexistent sales and showed them to investors who raised questions about Capitol's business.

27. Shapiro knew or was reckless in not knowing about Capitol's deteriorating financial condition. He exerted total control over Capitol's bank accounts and directed all of its activities. Shapiro failed to disclose Capitol's dire financial situation to investors, and instead continued to actively solicit new investor funds.

28. By 2009, Capitol had depleted the funds it needed to satisfy the outstanding promissory notes it had issued to investors. Shapiro ceased making payments to investors and refused to return their principal. However, Shapiro continued to solicit and receive new investor funds. For example, as late as July 2009, Shapiro asked an investor for funds he said he would return in five days. The investor agreed to loan Shapiro $170,000 and Shapiro gave him a note. However, Shapiro never repaid the investor. Shapiro also reassured investors who contacted him

for updates, blaming the delay on the default of a purchaser and the failure of a large supermarket chain.  He claimed Capitol would make payments despite the fact that Capitol had ceased business operations.

29. Additionally, Shapiro claimed he used investors' contributions to fund Capitol's purchase of grocery products.

30. Shapiro also siphoned at least $38 million of investor funds to fund his lavish lifestyle and finance outside business ventures unrelated to the grocery business.  These included his sports management business and several real estate ventures as well as to fund his lavish lifestyle.  Of this amount, Capitol's records reflect that Shapiro paid himself $23 million in salaries and commissions, and another $15 million in loans.

31. Shapiro's lifestyle included a $5 million home in Miami Beach, luxury cars, a $1 million boat, expensive clothes, high-stakes gambling, season tickets to premium sporting events and other entertainment.  Shapiro charged more than $640,000 of personal expenses to Capitol's corporate American Express Black Card, including $116,000 of charges a girlfriend incurred.  Shapiro's extravagant spending also extended to charitable donations.  For example, Shapiro donated funds to a local university's athletic program.

32. Shapiro also used investor funds to make large payments to sales agents in the form of undisclosed fees and commissions.  During the course of the scheme Shapiro paid at least $13 million to individuals in the form of undisclosed commissions and fees.

### V.  CLAIMS FOR RELIEF

#### COUNT I

#### Shapiro Violated Section 17(a)(1) of the Securities Act

33. The Commission repeats and realleges paragraphs 1 through 32 of its Complaint.

34. From at least February 2003 through November 2009, Shapiro, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

35. By reason of the foregoing, Shapiro directly or indirectly violated, and, unless enjoined, is reasonably likely to continue to violate, Section 17(a)(l) of the Securities Act [15 U.S.C. §77q(a)].

## COUNT II

### Shapiro Violated Section 17(a)(2) and (3) of the Securities Act

36. The Commission repeats and realleges paragraphs 1 through 32 of its Complaint.

37. From at least February 2003 through November 2009, Shapiro, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails: (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

38. By reason of the foregoing, Shapiro directly or indirectly violated, and, unless enjoined, is reasonably likely to continue to violate, Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

## COUNT III

### Shapiro Violated Section 10(b) and Rule 10b-5 of the Exchange Act

39. The Commission repeats and realleges paragraphs 1 through 32 of its Complaint.

40. From at least February 2003 through November 2009, Shapiro, directly or indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

41. By reason of the foregoing, Shapiro directly or indirectly violated, and, unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule l0b-5 [17 C.F.R. § 240].

## VI. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

### Declaratory Relief

Declare, determine, and find Shapiro committed the violations of the federal securities laws alleged in this Complaint.

### II.

### Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining Shapiro from violating Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act.

### III.

### A Sworn Accounting

Issue an Order requiring Shapiro to file with this Court a sworn written accounting identifying:

(1) All assets, liabilities and property currently held, directly or indirectly, by or for the benefit of Shapiro, including, without limitation, bank accounts, brokerage accounts, investments, business interests, loans, lines of credit, and real and personal property wherever situated, describing each asset and liability, its current location and amount;

(2) All money, funds, securities, property (real and personal), assets and income received by Shapiro, or for his direct or indirect benefit, at any time from February 1, 2003 through the date of such accounting, describing the source, amount, disposition and current location of each of the items listed; and

(3) The names and last known addresses of all bailees, debtors, and other persons and entities that currently are holding the assets, funds or property of Shapiro.

### IV.

### Disgorgement

Issue an Order directing Shapiro to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

### V.

### Civil Money Penalty

Issue an Order directing Shapiro to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and Section 21(d) of the Exchange Act [15 U.S.C. § 78(d)(3)].

## VI.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VII.

### Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

April 21, 2010     By:     s/Amie Riggle Berlin
Amie Riggle Berlin, Esq.
Senior Trial Counsel
Florida Bar No. 630020
Direct Dial:  (305) 982-6322
E-mail: berlina@sec.gov

Linda S. Schmidt
Senior Counsel
Florida Bar No. 0156337
Direct Dial: (305) 982-6315
E-mail : schmidtls@sec.gov

Attorneys for Plaintiff
**U.S. Securities and Exchange Commission**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone:     (305) 982-6300
Facsimile:     (305) 536-4154